STANDARD.MILL WORK & SUPPLY CO. *v.* MISSISSIPPI STEEL & IRON CO.

In Banc. Jan. 24, 1949.

(38 So. (2d) 448)

**Harmon W. Broom,** for appellant.

100

102

Stevens & Cannada, for appellee.

**Roberds, J.**

On August 13, 1945, Mississippi Steel & Iron Company, Inc., the appellee, which we will call the builder, entered

into a contract with Standard Millwork & Supply Company, a partnership, the appellant, which we will call the owner, under which the builder agreed to furnish the materials and construct for owner wall framing, roof framing, gable facia, a corrugated iron roof, etc., as constituent parts of a warehouse appellant proposed to erect in the community of Van Winkle, Jackson, Mississippi. The total price of the contract was $21,168.00, and the materials and work were to be in accordance with plans and specifications prepared by N. W. Overstreet, architect. The contract contemplated the issuance of progress certificates by the architect and the payment thereof by the owner from time to time as the work progressed, with a retainage of 15% until the job was completed. The roofing work was sub-let by the builder to Little Roofing Company. After the corrugated iron roof was applied to the north side of the building a strong wind greatly damaged that roof The Insurance Company adjusted that damage with the builder, who agreed with the owner to deduct $2040.00 from the contract price and the owner itself replaced the iron roof with an asbestos roof and released the builder from any further obligation with reference to the roof an the north side of the building. The owner, however, failed to pay the builder the full contract price for the materials and labor for the remainder of the job. The builder filed this bill against the owner, joining the Little Roofing Company as a party respondent, seeking to recover from the owner the balance owing under the contract. Complainant claimed that the principal unpaid balance aggregated approximately $6,551.36, plus interest, and also asked for a reasonable attorney's fee, as provided in the contract. The bill offered to pay the Little Roofing Company the amount owing it. The theory of the bill was that the contractor (1) had complied with its contract, but, if there had not been a literal compliance, there had been, (2) a substantial compliance, and it was entitled to recover in equity the balance of the contract price, less

the cost of remedying any defects in the quality of materials and workmanship, and that the owner had refused to pay in full the five progress certifications already made by the architect, and that the architect had arbitrarily and unreasonably declined to issue his progress certificate for the retained fifteen percent. The answer denied the contractor had literally or substantially complied with the contract, and then set up that the suit could not be maintained because (1) the architect had not issued his final certificate as to the completed work. and (2) because the contract contained an arbitration provision and the contractor had not resorted to arbitration.

The Chancellor awarded a decree to the builder in the total sum of $6,890.58, which consisted of the aggregate of the unpaid balances of the five progress certifications of the architect, plus legal interest on each from the dates of the respective progress certificates, plus the retained fifteen percent of the total contract, $500.00 attorney's fees, and one percent sales tax, less $250.00 to repair the defects in the roof. From this decree the owner appeals. The Little Roofing Company does not appeal.

Therefore, the questions presented on this appeal are:

First—Does the evidence justify the conclusion of the Chancellor that the contractor had substantially complied with the contract? In other words, can we say he was manifestly wrong in so holding?

Second—Does the fact that the architect, under the contract and the evidence in this cause, declined to issue his final certificate that the work had been completed in accordance with the contract bar complainant from prosecuting this suit?

Third—Does the arbitration provision in the contract preclude complainant from proceeding to final decree in this cause?

We will discuss and decide these three questions in the order stated.

The common-law rule required literal performance of building contracts, but the American courts ██ █ generally hold that substantial performance of such contracts will support a recovery either on the contract or on a quantum meruit basis. Three reasons are given for that holding. One is that materials and labor upon a building as such that even if rejected by the owner of the land he receives benefit thereof. Since the owner receives the benefits of the builder's labor and materials, it is equitable to require the owner to pay for what he gets. The second reason is that it is next to impossible for a builder to comply literally with all the minute specifications in a building contract. And the third is that the parties are presumed to have impliedly agreed to do what is reasonable under all the circumstances with reference to the subject of performance. 6 R. C. L., page 667, Sec. 343; 9 Am. Jur., page 30, Sec. 40; 17 C. J. S., Contracts, Sec. 508, page 1085; Hickory Investment Co. v. Wright Lumber Co., 152 Miss. 825, 119 So. 308.

 █ It is a necessity in support of the foregoing doctrine that the contractor must have acted in good faith and not intentionally failed to perform the contract. The rule of substantial performance can not be invoked where the failure to perform is wilful, intentional or due to carelessness, unless the omission falls within the category of de minimis, or unless the omission, though intentional, is due to a belief that performance in that respect is not required. 9 Am. Jur., page 31, par. 41.

The question of substantial performance is one to be determined in each case with reference to the existing facts and circumstances. █ Substantial performance is not literal, full or exact performance in every slight or unimportant detail, but performance of all important particulars. Substantial performance exists where the building or structure as a whole is not impaired; "where the building or structure can be . . . used after it is erected for its intended purpose; where

the defects can be remedied . . . without any great expenditure, and without material damage to other parts of the structure, and may without injustice be compensated for by deductions from the contract price . . .''. 17 C. J. S., Contracts, Sec. 509, page 1090.

Dealing now with the proof which pertains to this question, one witness testified he had never seen a better corrugated metal roof. Another said it was not a perfect job but "about as good a job as you could expect with a roof of that kind". Several testified that they had inspected the roof the morning following a very hard rain and they saw no indications of a leak or defect of any kind. There was further testimony that the contractor corrected all of the defects pointed out by the architect. On the other hand, there were witnesses for the owner who said they thought the "entire roof should be taken off and replaced by another". Between the extremes of a perfect roof and the necessity of entirely removing and replacing the roof, other witnesses said there were some defects and estimated the cost of remedying such defects, one saying $50.00 would be sufficient.

Also the architect in one of his certificates reported that in his opinion the work complied 95% with the requirements of the plans and specifications and in another certificate he said the work complied substantially with the plans and specifications.

Again, it is in evidence that the owner itself constructed vents through this roof and naturally in so doing the workmen had to walk upon the roof and it was the opinion of those having sufficient experience to qualify them as experts on corrugated roofs, that walking upon this roof caused a sag therein. If this evidence is correct, and the Chancellor had a right to believe it, this defect in the roof was no fault of the contractor. In this connection it might also be stated that these vents were placed in the roof by the owner because he had moved into the building and placed his machinery and equip-

ment therein and had proceeded to operate his business in the building.

It further appears from the testimony that the purlins, which are the supports for the roof, were perhaps too far apart and this fact resulted in a greater sag in the roof by walking thereon than would have occurred had the supports been nearer together. But there is testimony that this change in the spacing of the purlins was made by consent of the architect. So that not only does there appear a sharp conflict as to whether the roof was constructed according to the plans and specifications, but there is a question whether the defects, if any existed, were the result, in whole or part, of the acts of the owner and also by consent of the architect.

In view of all of this it is evident, we think, that this Court can not say that the learned Chancellor was manifestly wrong in his conclusion that the contractor had substantially complied with this contract.

In this connection, it is pertinent to note that the Chancellor concluded that it would take $250.00 to repair whatever defects existed in the roof. The testimony is vague and uncertain as to the amount necessary to make the repairs. The Chancellor did the best he could. We can not say that a more accurate amount could have been deducted from the evidence on that question in this record.

Dealing now with the second question, Article 5 of the Contract is as follows:

"Final payment shall be due thirty (30) days after full completion of the work, and inspection and approval by the Architect and owner. Before issuance of final certificate, the contractor shall submit evidence satisfactory to the Architect and owner that all payrolls, material bills and other indebtedness connected with the work have been paid."

The architect failed and refused to issue his final certificate that the completed work complied with

the contract. Appellant says this precludes the contractor from bringing this suit. We do not think that is the result. The recognized right to sue for substantial compliance with the contract necessarily means there has not been literal compliance therewith. If the contractor must obtain from the architect a final certificate of complete compliance before the contractor can bring a suit, he could never avail himself of the right to sue for substantial compliance. See MacDonnell v. Vitille, 111 N. J. Eq. 502, 162 A. 738; Harrild v. Spokane School District, 112 Wash. 266, 192 P. 1, 19 A. L. R. 811.

The answer raised no question as to payment of bills by the contractor.

As to the third question, Article 40 of the Contract provides:

"All disputes, claims or questions subject to arbitration under this contract shall be submitted to arbitration in accordance with the provisions, then obtaining, of the 'Standard Form of Arbitration Proceeds of the American Institute of Architects' and this agreement shall be specifically enforceable under the prevailing arbitration law, and judgment upon the award rendered may be entered in the hightest court of the forum, state or federal, having jurisdiction. It is mutually agreed that the decision of the arbitrators shall be a condition precedent to any right of legal action that either party may have against the other.

The answer in this case did not request an arbitration and ordinarily the action of a defendant in proceeding to trial upon the merits without demanding an arbitration is a waiver of the right for arbitration. Annotation, 117 A. L. R. 308.

Again, either party to a written agreement for submission to arbitration has the right to revoke the submission before award is made. Jones v. Harris, 59 Miss. 214; 3 Am. Jur. page 856, Secs. 30 and 31.

And a final and complete answer to this contention is that under testimony in this case the Chancellor could have concluded that the builder had offered to arbitrate this question.

Affirmed.